1   Laura Oswell (State Bar No. 241281)
    SULLIVAN & CROMWELL LLP
2   1870 Embarcadero Road
    Palo Alto, CA 94303
3   Telephone:   (650) 461-5600
    Facsimile:   (650) 461-5700

4

5   Garrard R. Beeney
    Laura R. Paliani
    Malaika R. Staten
6   SULLIVAN & CROMWELL LLP
    125 Broad Street
7   New York, New York 10004
    Telephone:   (212) 558-4000
8   Facsimile:   (212) 558-3588

9   Attorneys for Plaintiff

10               UNITED STATES DISTRICT COURT

11               NORTHERN DISTRICT OF CALIFORNIA

12

| | |
|---|---|
| VIA LICENSING CORPORATION, | Case No. |
| Plaintiff, | **COMPLAINT FOR:** |
| v. | **(1) BREACH OF CONTRACT;** <br> **(2) SPECIFIC PERFORMANCE;** <br> **(3) PROMISSORY FRAUD** |
| PEGATRON CORPORATION, PEGATRON TECHNOLOGY SERVICE INC. and UNIHAN CORPORATION, | **JURY TRIAL DEMANDED** |
| Defendants. | |

        Plaintiff VIA LICENSING CORPORATION ("Via"), by and through

its undersigned counsel, for its Complaint in this action, alleges as follows:

### NATURE OF THE ACTION

        1.     This is an action brought as a result of damages incurred by

Via as a result of  Defendants' breach of an Advanced Audio Coding license

agreement (the "AAC License"), for specific performance in light of Defendants'

refusal to abide by the plain terms of the AAC License, and for Defendants'

SULLIVAN & CROMWELL LLP

1    promissory fraud.  The AAC License was entered into by Via, a patent pool

2    administrator, acting on behalf of a group of owners of essential AAC patents, to

3    license their AAC patents to parties that manufacture, sell or supply products

4    incorporating AAC technology as described herein ("AAC Technology"), and by

5    Unihan Corporation ("Unihan"), a company that manufactures and sells consumer

6    and other devices using AAC Technology.  Defendant Pegatron Corporation is the

7    purported successor-in-interest to Unihan, and Defendant Pegatron Technology

8    Service, Inc. is the U.S. entity through which Unihan and Pegatron do business in

9    the United States (Pegatron Corporation and  Pegatron Technology Service, Inc.

10   are referred to hereinafter as "Pegatron").  Via brings this action to obtain

11   damages—including interest payments, audit expenses, and attorneys' fees as

12   provided by the AAC License—for the Defendants' continuing breaches of the

13   AAC License.  Via also brings this action to obtain specific performance of the

14   audit and reporting obligations of Unihan/Pegatron under the AAC License.

15   Finally, Via also brings this action to recover damages and punitive damages for

16   Defendants' fraud in inducing Via to enter into, and in falsely representing that

17   Defendants intended to perform under, the AAC License.

18            2.      Effective December 3, 2010, Unihan entered into the AAC

19   License with Via.  In exchange for the rights to various AAC patents licensed

20   under the AAC License, Unihan promised to make royalty payments to Via and,

21   further, to provide Via with quarterly reports specifying, among other things, the

22   quantity and description of products that include AAC Technology sold or

23   otherwise supplied by Unihan in a given calendar quarter.  Unihan also agreed to

24   permit Via audit rights to inspect Unihan's books and records so that Via could

25   ensure the accuracy and completeness of Unihan's reports and royalty payments

26   due under the AAC License.  Pegatron later assumed these obligations.

27            3.      Defendants have repeatedly breached the AAC License since it

28   was executed by failing to (i) submit proper reports; (ii) cooperate with Via to

COMPLAINT FOR BREACH OF CONTRACT, SPECIFIC PERFORMANCE AND PROMISSORY FRAUD

1  complete ongoing audits; or (iii) disclose to Via millions of units sold
2  incorporating AAC Technology and to pay the applicable royalty due on such
3  units.  Since at least October 2014, Defendants have refused to pay royalties on the
4  numerous unreported units, which they have sold, as required under the AAC
5  License.

6      4.      Defendants have also breached the AAC License by failing to
7  pay royalties on certain products they sold to certain of their customers who are
8  themselves Via licensees.  Under the AAC License, a licensee may agree with its
9  customers and suppliers who are also AAC licensees that, as an exception to the
10 reporting and payment obligations of each licensee, such other licensees may
11 inform Via by providing written notice specifying which of the licensees has
12 agreed to take over the reporting and payments of some or all of the other
13 licensees' products.  However, the licensees who make the original sales under
14 such an arrangement, like Defendants here, remain responsible for the license fees
15 due for such products they have sold if the electing (or purchasing) licensee fails to
16 pay the applicable royalties.  Some of Defendants' customers have not paid
17 royalties to Via for the products at issue here or provided the necessary notice to
18 Via.  Therefore, Defendants are responsible for paying those royalties to Via.

19     5.      Defendants have also breached the AAC License by (1) failing
20 to report, or pay royalties on, products incorporating AAC Technology that were
21 sold prior to the effective date of the AAC License ("Past Practice") as required
22 under the agreement and (2) refusing to provide data or documentation as to its
23 Past Practice to auditors pursuant to the audit clause in the agreement.

24     6.      Defendants have claimed after the fact, without support, that
25 they over-reported the number of units sold incorporating AAC Technology and
26 therefore are entitled to a *refund* of royalties paid.

27     7.      This conduct constitutes a clear breach of the unambiguous
28 provisions of the AAC License, and Defendants' failure to abide by the agreement

-3-

1   from the moment it was signed, in addition to other conduct alleged herein,

2   indicates Defendants' bad faith at the outset in entering into the AAC License

3   without ever intending to honor their obligations.

4                                   **PARTIES**

5          8.     Plaintiff Via is a Delaware corporation licensed to do business

6   and doing business in the State of California with its principal place of business at

7   100 Potrero Avenue, San Francisco, California 94017.  Via is in the business of,

8   among other things, developing and administering patent pool licensing programs,

9   otherwise known as "patent pools" as more fully described below.

10         9.     Defendant Pegatron Corporation is a Taiwanese corporation,

11   with its principal place of business at 5F, No. 76, Ligong Street, Beitou District,

12   Taipei, Taiwan.  Pegatron Corporation is an electronics manufacturing company

13   that develops computing, communications and consumer electronics products for

14   branded vendors.  Pegatron Corporation's primary products include notebooks,

15   netbook computers, desktop computers, game consoles, handheld devices,

16   motherboards, video cards and LCD TVs, as well as broadband communication

17   products such as smartphones, set-top boxes and cable modems.  Many of

18   Pegatron Corporation's products benefit from and incorporate AAC Technology.

19   Pegatron advertises and sells its products, including those incorporating AAC

20   Technology, in this judicial district.

21         10.    Defendant Pegatron Technology Service Inc. is an Indiana

22   corporation with its principal place of business at 121 River Ridge Circle,

23   Jeffersonville, Indiana 47130.  Pegatron Technology Service Inc. is a wholly

24   owned subsidiary of Pegatron Corporation.  On information and belief, Pegatron

25   Corporation advertises that it conducts business in the United States, including its

26   business in this judicial district, through Pegatron Technology Service Inc.

27

28

11.     Defendant Unihan is a Taiwanese corporation with its principal place of business at No. 150, Li-Te Road, Beitou District, Taipei 112, Taiwan. Unihan is a wholly owned subsidiary of Pegatron Corporation.

12.     Upon information and belief, Plaintiff alleges that there exists, and at all times herein there existed, a unity of interest and ownership between and among Defendants such that any individual separateness has ceased, and that there is no practical separation between them, such that Pegatron Corporation, Pegatron Technology Service Inc. and Unihan were and are alter egos of one another. Under the circumstances, recognition of Defendants as separate and distinct entities would be inequitable and would permit the corporate form to be used to promote fraud and injustice.

## JURISDICTION AND VENUE

13.     This Court has diversity jurisdiction over each of these claims pursuant to 28 U.S.C. § 1332 because the citizenship of the parties is diverse and the matter in controversy exceeds $75,000, exclusive of interest and costs.

14.     Venue and personal jurisdiction over Defendants is proper in the Northern District of California under 28 U.S.C. §§ 1391(b)-(c), for the reasons set forth above, and pursuant to Section 9.9 of the AAC License, in which Unihan/Pegatron agreed that "[t]his Agreement shall be deemed to have been made and entered into in San Francisco, California.  The Parties hereby submit to the jurisdiction of, and waive any venue objections against, the United States District Court for the Northern District of California, San Francisco Division and the Superior Court of the State of California, San Francisco County, in any litigation arising out of the Agreement."

## FACTUAL BACKGROUND

15.     MPEG Advanced Audio Coding is an audio compression technology first specified within the MPEG-2 specification by the International Organization for Standardization ("ISO") and the International Electrotechnical

Commission ("IEC") in 1997 (known as ISO/IEC 13818-7 "Information Technology—Generic coding of moving pictures and associated audio information—Part 7: Advanced Audio Coding"). MPEG Advanced Audio Coding was designed to provide high-quality audio at lower bit-rates than previous audio compression formats. As a consequence, devices that employ AAC Technology can offer high-quality audio while, among other benefits, saving transmission bandwidth, battery life and memory space.

16.   After the publication of the MPEG-2 specification, MPEG Advanced Audio Coding was extended within the MPEG-4 specification to include additional technologies. The extended MPEG Advanced Audio Coding technologies ("AAC") are described along with other audio codecs in ISO/IEC 14496-3 "Information Technology—Coding of audio-visual objects—Part 3: Audio."

17.   Because of its benefits, AAC has been widely adopted in the marketplace. It is utilized in numerous applications, including broadcast, streaming, telecommunications, automotive and personal/portable media applications. AAC is implemented in cellular phones, televisions, digital radios, game consoles and many consumer electronics products, including the Apple iPhone, iPod, iPad, AppleTV, Apple Watch; the Nintendo Wii and 3DS; Microsoft's Xbox, Lumia and Nokia branded phones, Sony's PlayStation 3, PlayStation Vita, TVs, cameras, portable music players, and tablets; BlackBerry phones and tablets; the Amazon Kindle Fire; the Roku Digital Media Player; Nikon cameras; and many other consumer electronic devices. AAC is also implemented in various PC-based products and platforms, including Microsoft Windows; Apple OS X and iTunes; Adobe Flash; and RealNetworks' RealPlayer. Currently, there are more than 750 users of AAC Technology which honor their intellectual property obligations by licensing patents essential to AAC Technology through the AAC License.

COMPLAINT FOR BREACH OF CONTRACT, SPECIFIC PERFORMANCE AND PROMISSORY FRAUD

18.     Via is a patent pool administrator.  As a patent pool administrator, Via offers to the marketplace licenses to patents essential to certain standardized technologies.  The Via pool licenses efficiently combine in a single license patents from multiple owners at a single reasonable royalty as an alternative to licensees entering into multiple bilateral licenses with individual patent owners.  The Via pool licenses, including the AAC License, provide in a single transaction rights to use essential patents which, without a license, would be necessarily and unavoidably infringed by the incorporation of the patented technology into a product for sale—*i.e.*, the practice of the applicable standard such as AAC, without a license, would infringe the essential patents which are licensed.  The essential patents licensed through Via's patent pools are owned or controlled by entities that participate in Via's patent pools as licensors.  The licensors authorize Via to license essential patents on their behalf to entities that practice the standardized technology.  All patents licensed through the AAC License have been or are members of patent families that have been reviewed by an independent expert who has determined that the patent or a patent in the patent family is essential to AAC Technology.

19.     One of the patent pools that Via administers is the AAC Patent Licensing Program.  The AAC License provides licensees with patent rights to licensors' essential AAC patents ("Essential AAC Patents") that read on the AAC Standard as defined in the AAC License.  The AAC Patent Licensing Program provides a convenient and cost-effective way for companies, such as Defendants, to acquire rights to practice the Essential AAC Patents from many patent owners in a single transaction.  The AAC License also provides a level playing field among users of AAC Technology because the same terms are available to all licensees.  Users of AAC Technology that either are unlicensed or do not abide by the terms of the AAC License have the option to negotiate and enter into bilateral licenses with essential patent owners.  Those who refuse either to enter into and abide by

-7-

COMPLAINT FOR BREACH OF CONTRACT, SPECIFIC PERFORMANCE AND PROMISSORY FRAUD

the terms of the AAC License or enter into bilateral licenses—and those such as Defendants who refuse to honor the terms of the AAC License—compete unfairly with those users of AAC Technology that honor their intellectual property obligations.

### **The AAC Patent License Agreement**

20.     On or about December 3, 2010, for valuable consideration, Via and Unihan entered into the AAC License, which sets forth the terms and conditions pursuant to which Via licensed to Unihan the Essential AAC Patents. The AAC License is attached hereto as Exhibit A.

21.     Via is identified as the "License Administrator" or "Via" and Unihan is identified as the "Licensee" under the AAC License.

22.     On or about December 31, 2013, Unihan and Pegatron Corporation merged pursuant to a merger agreement (the "Unihan/Pegatron Merger Agreement").  Pursuant to the Unihan/Pegatron Merger Agreement, Pegatron succeeded to all rights, obligations and liabilities of Unihan, including those arising under the AAC License.

23.     Section 1.2 of the AAC License defines "Affiliate" in part as "a separate corporation, company, or other entity that now or hereafter, directly or indirectly, controls, is controlled by, or is under common control of or with a party. The term 'control' as used in this definition means ownership of more than fifty percent of the outstanding shares or securities . . . of such corporation, company, or other entity."

24.     Section 1.15 of the AAC License defines "Licensed Product" in pertinent part as follows:

> (a) [A] complete (or substantially complete), ready-to-use End User decoding and/or encoding device or software, the making, using, importing, Sale or Otherwise Supplying of which would, in the absence of a license, infringe directly or indirectly a Licensed Patent, or (b) a component decoding and/or encoding device or software, the making, using, importing, Sale, or supplying of which would, in the

absence of a license, infringe directly or indirectly a Licensed Patent, that is Sold or Otherwise Supplied directly to an End User.

25.     Appendix B of the AAC License specifies the royalties due ("License Fees") depending on the type of device in which AAC is implemented. For "Licensed Products (Other than PC Software)," as defined in the AAC License, the licensee is required to pay a per-unit fee that decreases as the sales volume increases, and which resets annually ("Standard Rates").  The Standard Rates for these products range from $0.98 per unit for the first 500,000 units sold within a year to $0.15 per unit for each unit over 50 million sold within a year. Appendix B also provides that products with more than two "Channels" count as 1.5 units.

26.     Section 2.4.1 of the AAC License provides that Unihan/Pegatron "unconditionally and irrevocably guarantees performance under this Agreement by all its Affiliates." Section 2.4.2 of the AAC License provides that, if any of Unihan's/Pegatron's Affiliates "breaches or does not perform a duty or obligation pursuant to this Agreement," Unihan/Pegatron shall "as soon as reasonably practicable, cure such breach or perform such duty or obligation." Section 2.4.2 further provides that Via in its sole discretion shall have the right to proceed "directly against" Unihan/Pegatron or its Affiliate for such breach or non-performance.

27.     Section 4.2 of the AAC License requires Unihan/Pegatron to provide quarterly reports within 30 days following the end of every calendar quarter following the effective date of the AAC License, which reports must include, among other things, the quantity and description of Licensed Products sold or otherwise supplied pursuant to the AAC License by Unihan/Pegatron and/or its designated affiliates during the quarter and the number of Licensed Products sold that are multichannel products as defined in the AAC License.

28.     Section 4.3 of the AAC License requires Unihan/Pegatron to pay License Fees within 30 days following the end of each calendar quarter, along

-9-

1  with its quarterly reports.  In addition, Section 4.5.3 of the AAC License specifies

2  that late payments (defined as those made more than 30 days after they are due)

3  shall bear interest at the rate of 10% per year, compounded monthly.

4         29.     Section 4.3.2 of the AAC License provides that if

5  Unihan/Pegatron sells products to a customer who is also an AAC licensee with

6  Via ("Other Licensee"), Unihan/Pegatron may agree with the Other Licensee that

7  the Other Licensee will report and pay royalties on those products.  Section 4.3.2

8  provides that Unihan/Pegatron would remain responsible for License Fees on

9  Licensed Products if the Other Licensee failed to report and pay License Fees that

10  are due.  Section 4.3.2 also requires both Unihan/Pegatron and the Other Licensee

11  to provide written notice to Via of such an agreement.

12         30.     Section 4.6.4 of the AAC License provides that within 30 days

13  following the effective date of the AAC License Unihan is obligated to provide Via

14  a written report identifying any Licensed Products sold or otherwise supplied

15  "during the entire period prior to" the effective date of the agreement, together

16  with payment for royalties and interest thereon.

17         31.     Section 4.7 of the AAC License requires that Unihan/Pegatron

18  "keep true, correct, and complete books and records of all sales, licenses, leases,

19  uses, returns, disposals, or other transfers of Licensed Products under this

20  Agreement for at least five years."  This section also gives Via the right to select an

21  independent and professionally licensed accounting firm "to audit, inspect and

22  make abstracts of such books and records, at Licensee's facility (or elsewhere as

23  determined by the Auditor) as necessary to verify their accuracy and that of all

24  other written reports and statements provided for herein, and verify or determine

25  fees paid or payable under this Agreement."

26         32.     Section 4.7 of the AAC License further provides that "[i]f the

27  audit shows an underpayment, then Licensee shall immediately pay the amounts

28  due, plus accrued interest, plus the cost of the Audit if applicable, after receiving

-10-

notice of the results of the applicable Audit.  Licensee will pay the cost of the Audit if, for any calendar year under inspection in that audit, an underpayment of five percent or more is found, based on payments or reports received prior to notice of the Audit."

33.     Section 6.4 of the AAC License provides that Licensee "may terminate this Agreement at will by providing Via with at least 60 days prior written notice."

34.     Section 9.9 of the AAC License provides that "[t]his Agreement shall be governed by, and construed in accordance with, the substantive law of the State of California."  Section 9.9 also provides for the recovery of attorneys' fees by the prevailing party in any dispute under the agreement.

**Unihan Licenses Essential AAC Patents Under the AAC License and Terminates the AAC License and Pegatron Subsequently Willfully Infringes Essential AAC Patents**

35.     Unihan and Via entered into the AAC License, effective December 3, 2010.

36.     Unihan failed to submit timely quarterly reports for the first few quarters immediately following execution of the AAC License, as required by Section 4.2, despite numerous reminders from Via.

37.     On or about November 1, 2013, Unihan sent Via a purported notice of termination of the AAC License, providing 60 days' written notice of termination pursuant to Section 6.4 of the AAC License (the "Termination Notice").  Unihan informed Via that the AAC License would be terminated on December 30, 2013, despite the pendency of an ongoing audit (described below).

38.     Upon information and belief, since terminating the AAC License on December 30, 2013, Defendants have continued to include AAC Technology in multiple products without a license from or permission by any Essential AAC Patent owner.  As such, Defendants not only misappropriate the

-11-

valuable intellectual property of others, but Defendants also unfairly compete with hundreds of licensees.

**Pegatron Breaches Its Promises and Obligations and Refuses to Pay Royalties Owed for Licensed Products Sold Under the AAC License**

39.     On or about May 14, 2013, Via sent Unihan a letter invoking its audit rights pursuant to Section 4.7 of the AAC License (the "Audit Notification Letter").  Via sought an audit of Unihan's records for the period December 3, 2010—the day Unihan and Via executed the AAC License—through March 31, 2013, as well as any Past Practice sales prior to the effective date.  Via selected Connor N Corporation ("Connor") as the accounting firm to conduct the audit (the "Connor Audit").

40.     On or about July 10, 2013, Unihan and Connor executed a Non-Disclosure/Confidentiality Agreement related to the Connor Audit.

41.     On or about April 14, 2014, Pegatron, as the successor in interest to Unihan, and Via met to discuss the Connor Audit.  The Connor Audit proceeded, and the Audit uncovered millions of units sold by Pegatron that Pegatron was required to report and for which royalties were due but for which Pegatron had not made any payment.

42.     On or about June 9, 2014, Via sent Pegatron several documents related to the Connor Audit results, including (i) a summary of the findings of the Connor Audit (the "Audit Findings"); (ii) Connor's findings; (iii) the corresponding invoices based on the Audit Findings for the period December 3, 2010 through March 31, 2013; and (iv) an invoice for audit expenses and fees.  Via was not able to assess the amounts due for Pegatron's Past Practice because Pegatron refused and continues to refuse to abide by its obligations to provide Via with necessary information regarding its Past Practice (and refuses to pay applicable royalties for such Past Practice), and, therefore, Via has been unable to issue an invoice to Pegatron for the Past Practice sales.  On information and belief,

1   Connor also provided its audit results to Pegatron.  Since receiving the Audit

2   Findings, Pegatron has refused to pay amounts due, sought to delay a resolution of

3   the Connor Audit, taken inconsistent positions in an effort to avoid the results of

4   the Connor Audit, refused to pay any of the outstanding invoices, and otherwise

5   acted in bad faith.

6          43.    In the Audit Findings, Connor identified products sold by

7   Unihan to customers who were not Via licensees that had not been reported to Via,

8   in breach of the AAC License.  The Audit Findings demonstrated that these

9   unreported sales had started from the very instant that the AAC License was

10  entered into.  The Audit Findings demonstrate that Pegatron is responsible under

11  the AAC License for millions of dollars in unpaid License Fees—for millions of

12  unreported units sold—plus interest, which has continued to accrue, and audit

13  expenses.

14         44.    The Audit Findings show that Via had not received signed

15  notices from some of the licensees that Unihan had indicated were paying License

16  Fees on Unihan's behalf, as required by Section 4.3.2 of the AAC License.  Via

17  stated repeatedly in correspondence to Unihan that, as provided in Section 4.3.2,

18  Unihan remained responsible for any associated License Fees owed by those

19  licensees.

20         45.    The Audit Findings demonstrate that Pegatron was responsible

21  for License Fees on semi-knock-down ("SKD") products incorporating AAC

22  Technology that, upon information and belief and based on Pegatron's own

23  representation to Via, Pegatron sold to Pegatron Czech s.r.o. ("PCZ") for final and

24  minor assembly, which PCZ  ultimately sold to Pegatron's customers.  Upon

25  information and belief, PCZ is a subsidiary and Affiliate of Pegatron Corporation,

26  within the meaning of the AAC License.

27         46.    Following its receipt of the Audit Findings, Pegatron initially

28  sought to delay complying with its obligations with respect to SKD products, and

-13-

then on, or about October 24, 2014, sent Via an email asserting without support that the SKD products sold were not Licensed Products as defined in the AAC License and "should not be royalty bearing" because the products were not final products but instead required "separate sophisticated equipment to assemble . . . into a finished product," which was completed by its subsidiary PCZ and subsequently sold to Pegatron's customers.   Unihan/Pegatron, however, had previously confirmed to Via that the products were essentially complete when shipped to PCZ and only reversed its position after receiving the results of the Connor Audit.

**Pegatron Asserts Without Support That It**

**Over-reported Royalties Owed to Via**

47.   On or about October 24, 2014, Pegatron wrote to Via asserting for the first time that Unihan/Pegatron had "reported wrong channels" in prior quarterly reports, stating that Unihan/Pegatron had reported all products as "more than 2 channels" (so that "each unit was counted as 1.5 unit" under the AAC License) when they were "actually 2 channel Not 'more than 2 channels.'" Accordingly, Pegatron requested a refund for Unihan's/Pegatron's purported "mistake."  Upon information and belief, Unihan/Pegatron initially confirmed to Connor that the products were multichannel and only reversed its position after receiving the Audit Findings.

48.   On or about November 8, 2014, Via responded to Pegatron by email, questioning Pegatron's unsupported assertions and requesting documentation supporting Pegatron's new claims.  On information and belief, Connor had previously requested similar documentation and Pegatron had failed to provide it.  On or about November 12, 2014, Pegatron responded that it was preparing "supporting document" for its "2 channel claim."  To date, Via has received no such documentation.

-14-

**Pegatron Fails to Report and Pay Royalties Owed for Licensed Products Sold Prior to Entering Into the AAC License**

49.    At no point since executing the AAC License has Unihan/Pegatron provided Via a written report of Licensed Products sold prior to the effective date of the agreement as required under Section 4.6.4. of the AAC License, nor has Unihan/Pegatron paid License Fees on such Licensed Products. As Via informed Pegatron in its Audit Notice, as well as in a subsequent email correspondence discussing the Audit Findings, the AAC License provides Via the right to confirm sales prior to the effective date.

50.    Unihan/Pegatron has also refused to provide Connor with any data or records concerning its Past Practice of the AAC standard, prior to entering into the AAC License, as required by the AAC License.

51.    Upon information and belief, and based on Connor's extrapolation using the information that was provided by Unihan/Pegatron, accurate records regarding such Past Practice will show that royalties owed by Defendants on Licensed Products sold prior to the effective date of the agreement will amount to millions of additional dollars in unpaid royalties.

52.    On or about December 8, 2014, Via sent Pegatron a Final Notice of Material Default outlining Pegatron's failure to fulfill its obligations under the AAC License and attaching an invoice for over $2.5 million in unpaid License Fees that had been determined to the date of the Final Notice, plus audit fees and expenses, and interest as of that date.  Under the terms of the AAC License, interest continues to accrue.  As noted, because Pegatron has refused to provide information regarding its Past Practice, this royalty invoice did not include any Past Practice sales.  The Final Notice of Material Default is attached hereto as Exhibit B.

53.    Since the initiation of the Connor Audit, the parties have engaged in several calls, met in person, and exchanged numerous letters and emails

-15-

COMPLAINT FOR BREACH OF CONTRACT, SPECIFIC PERFORMANCE AND PROMISSORY FRAUD

1   concerning Pegatron's multiple breaches, none of which has resolved the dispute.
2   Most recently, Pegatron sent Via a letter on January 14, 2015, again disputing
3   Via's assertions and promising to provide documentation supporting Pegatron's
4   position.  To date, Via has received no such documentation.  Furthermore, at
5   various times during course of the parties' oral communications, Pegatron has
6   refused to discuss the merits of Via's claims and instead, in bad faith, has
7   suggested that Via may be without a remedy for Pegatron's breaches.

8         54.     Thus, as described above, since entering into the AAC License,
9   Pegatron has repeatedly breached its obligations, failed from the very beginning to
10  report licensed devices which it sold and for which royalties were due, asserted
11  positions without support, refused to provide required documentation, failed to
12  abide by the Audit Findings, and competed unfairly by selling devices that
13  incorporate AAC Technology without a license.

14              **<u>FIRST CAUSE OF ACTION</u>**

15                 **(Breach of Contract)**

16        55.     Via incorporates by reference each of the allegations in
17  paragraphs 1 through 54 of this Complaint as if fully set forth herein.

18        56.     Via and Unihan entered into the AAC License on December 3,
19  2010.

20        57.     The AAC License is valid and enforceable and supported by
21  adequate, mutual consideration.

22        58.     Via has performed each and every one of its material
23  obligations under the AAC License.

24        59.     Pegatron has breached the AAC License by failing to provide
25  accurate reports or pay proper royalties, interest and audit expenses as provided in
26  the AAC License.

27        60.     Pegatron has also breached the AAC License by failing to
28  provide the auditor with its books and records as necessary to inspect

-16-

1    Unihan/Pegatron's Past Practice of the AAC standard as provided in the AAC

2    License.

3          61.    Via has been damaged by Pegatron's breach of contract in an

4    amount to be determined at the trial of this matter.

5          62.    Via is further entitled to attorneys' fees pursuant to the AAC

6    License.

7    **SECOND CAUSE OF ACTION**

8    **(Specific Performance)**

9          63.    Via incorporates by reference each of the allegations in

10    paragraphs 1 through 54 of this Complaint as if fully set forth herein.

11          64.    Via and Unihan entered into the AAC License on December 3,

12    2010.

13          65.    Section 4.7 of the AAC License unambiguously provides Via

14    with the right to audit the books and records and inspect and make abstracts of

15    Unihan's books and records.

16          66.    Via reminded Unihan of its obligations under Section 4.7 of the

17    AAC License in an Audit Notification Letter, which it sent to Unihan on May 13,

18    2013.

19          67.    Notwithstanding these unambiguous terms, Unihan has refused

20    to cooperate with the audit as requested by Via, in breach of the AAC License.

21          68.    Via and, on information and belief, Connor have repeatedly

22    asked that Pegatron honor its obligation to provide sales and other Past Practice

23    information as required by the License.  Pegatron has refused to do so.

24          69.    Unihan has breached the AAC License by, without limitation,

25    failing to fully and timely make royalty payments owed to Via under the AAC

26    License, refusing to provide the auditor with access to its data and records

27    concerning its Past Practice, and intentionally underreporting various sales

28    information and underpaying the royalties owed to Via.

-17-

70.     The AAC License, including the audit provisions contained therein, is just and reasonable and supported by adequate, mutual consideration.

71.     Via has performed each and every one of its material obligations under the AAC License.

72.     Via hereby affirms the AAC License and seeks Unihan's performance thereunder, including compliance with Via's audit rights.

73.     The terms of the AAC License are sufficiently definite to enable the Court to specifically enforce them.

74.     Due to Unihan's refusal to allow Via to audit its books and records, Via is unable to ascertain the true amount of damages that would afford complete and adequate relief without the requested audit.

75.     Via thus has no adequate legal remedy in that the damages caused by Unihan's breach of the AAC License, if awarded, cannot be properly ascertained.

76.     Based on the foregoing, Via seeks a judgment from this Court ordering that Unihan specifically perform its contractual obligations and permit the requested audit by Via.

### THIRD CAUSE OF ACTION

### (Promissory Fraud)

77.     Via incorporates by reference each of the allegations in paragraphs 1 through 54 of this Complaint as if fully set forth herein.

78.     Via and Unihan entered into the AAC License on December 3, 2010.

79.     By entering into the AAC License, Unihan promised, among other things, to make accurate reports, pay applicable royalties that were due, and "[i]f [an] audit shows an underpayment . . . immediately pay the amounts due, plus accrued interest, plus the cost of the Audit if applicable, after receiving notice of the results of the applicable Audit."

-18-

80.     The foregoing representations made by Unihan in entering into the AAC License were knowingly false, in that Unihan entered into the AAC License without any intention of performing its obligations thereunder.  In fact, Unihan/Pegatron has never fully abided by its obligations under the AAC License. From the moment the AAC License was signed, Unihan/Pegatron did not provide accurate reports, did not pay royalties due, and has refused to pay to Via amounts due as a result of the audit.  Unihan/Pegatron entered into the AAC License never intending to provide accurate reports or pay Via for all Licensed Products it sold as provided in the AAC License.

81.     Each of the foregoing false representations made by Unihan in entering into the AAC License was made with the intent to defraud Via, by inducing Via to enter into the AAC License.

82.     Unihan's fraudulent intent in inducing Via to enter into the AAC License is evidenced by, among other things,  Defendants' failure to comply with its obligations from the earliest reporting period following execution of the AAC License.  For example:

a.   Section 4.2 of the AAC License requires Unihan/Pegatron to provide Via with quarterly reports within 30 days following the end of every calendar quarter following the effective date.  Section 4.2.1 specified the contents of the quarterly reports, including very specific information about the quantity and description of Licensed Products sold.

b.   On or about June 2013, Via audited Pegatron.  The audit revealed significant underpayment of royalties plus interest, which continues to accrue.  The audit confirmed that, from the inception of the AAC License, Unihan/Pegatron consistently and intentionally underreported various sales information, affecting the royalties owed to Via.

-19-

1   Pegatron continues to refuse to remit payment of royalties and interest

2   owed for Licensed Products.

3   c.   Pegatron has argued that certain SKD products are not subject to

4   royalties under the AAC License because they were not final products

5   when sold by Pegatron to its subsidiary and Affiliate PCZ,

6   notwithstanding the fact that Unihan/Pegatron initially confirmed to

7   Via that the SKD products were essentially complete when shipped to

8   PCZ and only reversed its position after receiving the results of the

9   Connor Audit.  Moreover, these fully assembled Licensed Products

10   were ultimately sold to Pegatron's customers.  Pegatron's blatant

11   change of position as to the completeness of its SKD products and its

12   attempt to avoid its obligation to pay royalties under the AAC License

13   by selling SKD products to a subsidiary for purported assembly and

14   sale demonstrate Pegatron's bad faith from the outset.

15   d.   Section 4.6.4 of the AAC License requires Unihan/Pegatron to

16   provide Via with a written report within 30 days following the

17   effective date identifying any Licensed Products sold or otherwise

18   supplied "during the entire period prior to" the effective date of the

19   agreement, together with payment for fees and interest thereon.

20   e.   Unihan/Pegatron has never provided Via with any written report

21   identifying Licensed Products sold prior to the effective date, nor has

22   Unihan/Pegatron paid royalties on any such Licensed Products.

23   Pegatron also refused to provide the auditor with data or records

24   concerning its Past Practice.  Based on the information Pegatron did

25   provide to the auditor, the auditor extrapolates that the past sales

26   royalties would be significant.

27   83.   Defendants' fraudulent intent is further evidenced by their

28   termination of the AAC License, after having acknowledged the need to obtain

-20-

1  license(s) for the Essential AAC Patents, and subsequent failure to negotiate
2  licenses directly with the AAC licensors.  Since December 2013, Pegatron has
3  been willfully and continuously infringing the Essential AAC Patents.

4       84.    Via justifiably relied on Unihan's/Pegatron's fraudulent
5  representations in the AAC License by entering into that agreement.

6       85.    Via actually and justifiably relied to its detriment on
7  Unihan's/Pegatron's false promises because Via reasonably believed that
8  Unihan/Pegatron would pay royalties owed and comply with its other obligations
9  under the AAC License.

10       86.    As a direct and proximate result of its reliance on
11  Unihan's/Pegatron's fraudulent representations, Via was injured in an amount to be
12  determined at trial.

13       87.    Via is informed and believes and, on that basis, alleges that
14  Unihan/Pegatron acted with full knowledge of the consequences and damages
15  caused or likely to be caused to Via.

16       88.    Unihan/Pegatron acted with malice, fraud or oppression,
17  entitling Via to an award of punitive damages.

18               **DEMAND FOR JURY TRIAL**

19       89.    Please take notice that Plaintiff demands a trial by jury in this
20  action.

21               **PRAYER FOR RELIEF**

22       WHEREFORE, Plaintiff VIA LICENSING CORPORATION prays
23  for the following relief:

24       A.    For damages for breach of contract in an amount to be
25            determined at trial, but no less than the jurisdictional amount of
26            this Count;

27       B.    For an order for specific performance of the audit rights under
28            the AAC License, Section 4.7;

SULLIVAN & CROMWELL LLP

1        C.   For attorneys' fees incurred in connection with this action,

2              pursuant to the AAC License, Section 9.9;

3        D.   For contractual interest as provided under the AAC License,

4              Section 4.5.3;

5        E.   For audit expenses as provided under the AAC License, Section

6              4.7;

7        F.   For general, special and consequential damages according to

8              proof at trial;

9        G.   For punitive damages in the discretion of the jury;

10       H.   For prejudgment interest and to the extent allowed by law; and

11       I.   For such other and further relief as the Court deems just and

12             proper.

13

14  Dated:    September 8, 2015

15                                                  */ s / Laura Oswell*

                                           Laura Oswell (State Bar No. 241281)

16                                             SULLIVAN & CROMWELL LLP

                                         1870 Embarcadero Road

17                                           Palo Alto, CA 94303

                                         Telephone: (650) 461-5600

18                                           Facsimile: (650) 461-5700

19                                           Garrard R. Beeney

                                         Laura R. Paliani

20                                           Malaika R. Staten

                                         SULLIVAN & CROMWELL LLP

21                                           125 Broad Street

                                         New York, New York 10004

22                                           Telephone:  (212) 558-4000

                                         Facsimile:  (212) 558-3588

23                                           Attorneys for Plaintiff

24

25

26

27

28

-22-

COMPLAINT FOR BREACH OF CONTRACT, SPECIFIC PERFORMANCE AND PROMISSORY FRAUD